**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 2, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JESSE C. TRENTADUE,

        Plaintiff - Appellee,

v.

FEDERAL BUREAU OF
INVESTIGATION; FEDERAL
BUREAU OF INVESTIGATION'S
OKLAHOMA CITY FIELD OFFICE,

        Defendants - Appellants.

No. 08-4207

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CV-00772-DAK)**

---

Nicholas Bagley, Assistant United States Attorney, Appellate Staff Civil
Division, (Gregory G. Katsas, Assistant Attorney General, Brett L. Tolman,
United States Attorney, and Mark B. Stern, Assistant United States Attorney,
Appellate Staff Civil Division, with him on the brief), of Washington, D.C. for
Defendants-Appellants .

Jesse C. Trentadue, pro se.

---

Before **TACHA**, **EBEL**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Jesse Trentadue, apparently spurred by concern about the death of his brother in federal custody, has vigorously sought information concerning investigations conducted by the Federal Bureau of Investigation (FBI).[1] This appeal arises out of his suit under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain records of the FBI's investigation into the infamous bombing of the Alfred R. Murrah Federal Building in Oklahoma City in 1995. His request is limited to records that relate to the Southern Poverty Law Center (SPLC) and its founder Morris Dees. After initially producing no records, the FBI eventually provided 19 redacted documents, and the district court ruled that the agency need not conduct any further searches of its records. Several months later, however, Mr. Trentadue moved the court for permission to depose Terry Nichols, a convicted conspirator in the Oklahoma City bombing, and David Paul Hammer, a death-row inmate who purportedly had discussed the bombing with a fellow inmate, Timothy McVeigh, who was executed for his role in the bombing. In support of the motion, Mr. Trentadue submitted declarations by Nichols and Hammer. The court granted the motion over the FBI's objections.

The FBI appeals the discovery order, and we reverse. The FBI submitted declarations to the district court that provide a consistent and uncontradicted showing that it has conducted an adequate search for the records requested by

---

[1]We see no purpose in expanding upon Mr. Trentadue's beliefs concerning the connection between the investigations and his brother's death.

Mr. Trentadue, and there is no reason to believe that depositions of Nichols and Hammer would produce evidence relevant to this FOIA case.

## I.  FOIA

FOIA was enacted to enable the public to examine government records. *See Campaign for Responsible Transplantation v. FDA*, 511 F.3d 187, 190 (D.C. Cir. 2007) ("FOIA is a disclosure statute enacted to facilitate public access to Government documents." (internal quotation marks omitted)).  The general rule under FOIA is that a person is entitled to copies of a federal agency's records upon making a request that "reasonably describes such records" and that complies with required procedures for such requests.  5 U.S.C. § 552(a)(3)(A)(i).  Certain categories of records, however, are exempt from disclosure.  *See id.* § 552(b)(1)–(b)(9) and § 552(c)(1)–(c)(3).  When a request is made, the agency ordinarily must "determine within 20 [business] days . . . whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor . . . ."  *Id.* § 552(a)(6)(A)(i).  If the agency decides to comply with the request, "the records shall be made promptly available" to the requester.  *Id.* § 552(a)(6)(C)(i).  If the agency decides not to comply, the requester can seek relief in federal court.  District courts have "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

FOIA does not set forth a general standard regarding how hard an agency must look to find requested records.  On that issue the sole relevant provision, which was added in 1996, states:  "In responding under this paragraph to a request for records, an agency shall make *reasonable efforts to search for the records* in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system."  *Id.* § 552(a)(3)(C) (emphasis added); Pub. L. 104-231, § 5(4), 110 Stat. 3048 (1996).  Although § 552(a)(3)(C) concerns only electronic searches, it appears to reflect an implicit assumption by Congress that an agency's search for records need only be "reasonable" in scope and intensity.  The circuit courts to address the issue have so construed FOIA - both in its original form, *see Nat'l Cable Television Ass'n, Inc. v. FCC*, 479 F.2d 183, 192 (D.C. Cir. 1973), and since § 552(a)(3)(A) acquired its present form in 1974, *see Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986) (adequacy of search "is measured by the reasonableness of the effort in light of the specific request"); *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *Goland v. CIA*, 607 F.2d 339, 352 & n.78, 369–70 (D.C. Cir. 1978); *Gillin v. IRS*, 980 F.2d 819, 822 (1st Cir. 1992) (following *Meeropol*); *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995) (agency need not perform search that is "unreasonably burdensome"); *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 182 (3d Cir. 2007) (per curiam); *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 362 (4th Cir. 2009)

(following *Meeropol*); *Patterson v. IRS*, 56 F.3d 832, 841 (7th Cir. 1995) (following *Meeropol*); *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) ("[T]he search need only be reasonable; it does not have to be exhaustive."); *Zemansky v. U.S. EPA*, 767 F.2d 569, 571 (9th Cir. 1985) ("[A]dequacy of the search . . . is judged by a standard of reasonableness . . . .") (internal quotation marks omitted); *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1257 (11th Cir. 2008) (following *Meeropol*).

We follow our sibling circuits. Their "reasonableness" rule is a realistic interpretation of FOIA. Although FOIA might be read to demand that an agency provide every nonexempt requested document regardless of the cost of locating it, we doubt that Congress would have chosen to impose "unreasonable" burdens on agencies in that regard.

In light of the reasonable-search requirement, the focal point of the judicial inquiry is the agency's search process, not the outcome of its search. "The issue is *not* whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate[,] . . . [which is determined under] a standard of reasonableness, and is dependent upon the circumstances of the case." *Weisberg*, 705 F.2d at 1351 (brackets, citations, and internal quotation marks omitted); *see Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 547 (6th Cir. 2001) ("The question focuses on the agency's search, not on whether additional documents exist that might satisfy the request."); Office of

Info. & Privacy, U.S. Dep't of Justice, Freedom of Information Act Guide at 103–13, 954–58 (2007); 1 James T. O'Reilly, Federal Information Disclosure § 7:4 at 164 (3d ed. 2000) ("The courts require reasonable, not extraordinary, searches by the agency. . . . The test is adequacy of the search, not existence of any record."). The reasonableness of an agency's search turns on "the likelihood that it will yield the sought-after information, the existence of readily available alternatives, and the burden of employing those alternatives." *Davis v. Dep't of Justice*, 460 F.3d 92, 105 (D.C. Cir. 2006).

## II.    BACKGROUND AND PROCEEDINGS BELOW

### A.    The FOIA Request

On July 19, 2004, Mr. Trentadue submitted a letter to the FBI and its Oklahoma City Field Office, making two requests under FOIA. The first request was for a January 4, 1996, "memorandum from former FBI Director [Louis] Freeh concerning Morris Dees and the Southern Poverty Law Center ('SPLC')" (which we will call "the Freeh Memorandum"). J.A. Vol 1 at 39. The memorandum, according to Mr. Trentadue, referenced an "SPLC informant at Elohim City," *id.*, the site of what he characterizes as a "white supremacist paramilitary camp compound" in Oklahoma that included persons purportedly involved in the Oklahoma City bombing, *id.* Vol. 4 at 986. Mr. Trentadue's letter attached a newspaper article describing the Freeh Memorandum.

Mr. Trentadue's second request was for records

which, directly or indirectly, report upon, concern, reference or refer to Morris Dees' and/or the SPLC's involvement with and/or connection to the following: Elohim City, OKBOMB, BOMBROB, Tim McVeigh, Richard Guthrie, Terry Nichols, Dennis Mahon,[] Robert Millar, Michael Brescia, Peter Langan and/or Andreas Strassmeir including all contacts Dees or the SPLC may have indirectly had with the foregoing through informants.

*Id.* Vol. 1 at 40. OKBOMB is a reference to the FBI's investigation of the

Oklahoma City Bombing. BOMBROB refers to the FBI's investigation of the

Mid-West Bank Robbery Gang, a group of neo-Nazis who, according to

Mr. Trentadue, were "suspected by the FBI of being involved in the robbery of

banks to fund attacks upon the government of the United States." *Id.* at 47. The

request continued:

> In searching for documents - records responsive to this Freedom of In[f]ormation Act request, I want you to look beyond the official files at FBI Headquarters and the Oklahoma City Field Office. Specifically, in addition to all responsive documents - records from the FBI's official files, I want all responsive documents - records from the I - Drive, S - Drive and/or any other electronic device used for purposes of document - evidence storage, retention, holding, review, etc. at FBI Headquarters and/or the Oklahoma City Field Office, including any responsive documents - records from temporary document, record, data and/or evidence storage locations, files and/or facilities regardless of where such storage files or facilities are located.

*Id.* at 23.

One week later the FBI sent to Mr. Trentadue a form letter confirming

receipt of his FOIA request.

**B.      Mr. Trentadue's Suit**

### 1. The Claim and Summary-Judgment Motions

Because the FBI had not produced the requested records within 20 business days, *see* 28 C.F.R. § 16.6(b), Mr. Trentadue initiated a FOIA suit against the FBI and the FBI Oklahoma City Field Office on August 20, 2004, in the United States District Court for the District of Utah. (We will refer to the defendants jointly as the FBI.) He alleged that the FBI had a duty under FOIA to produce the requested documents and that there was no legal basis to withhold them. (Mr. Trentadue later amended his complaint to pursue an additional FOIA request. For simplicity, we will address that request only when relevant to this appeal.)

The FBI answered on September 20. It sought dismissal of the complaint, asserting that it was "exercising due diligence to process [Mr. Trentadue's] requests as quickly as possible." J.A. at 55.

Mr. Trentadue then moved for partial summary judgment with respect to the Freeh Memorandum, arguing that he had already seen the memorandum, which the FBI had produced in response to a FOIA request from someone else. He also argued that the FBI had waived any exemptions to production under FOIA by failing to assert them in the letter to him or in its answer to the complaint.

On November 22 the FBI responded to Mr. Trentadue's partial-summary-judgment motion and filed its own summary-judgment motion, contending that it had responded to his request and that his claims were now moot. It said that it

could not provide documents concerning Morris Dees unless it received proof of his death or a privacy waiver signed by him. As for the remainder of Mr. Trentadue's FOIA request, the FBI said that it could not find any requested documents. Its memorandum attached a letter to Mr. Trentadue sent by the FBI on November 18. The letter stated, "Based on the information you provided, we have not located [the Freeh] memorandum through a search of our indices of our Central Records System . . . ." *Id.* at 77. And with respect to the remainder of Mr. Trentadue's request (other than the allegedly protected information regarding Dees), the letter said that a search "of the indices in our Central Records System files both at FBI Headquarters and in the Oklahoma City Field Office[] has revealed no responsive records." *Id.* at 78.

### 2. Mr. Trentadue's Allegations of Bad Faith and the FBI Responses

Mr. Trentadue responded to the FBI's memorandum by arguing that the FBI was intentionally withholding documents and acting in bad faith. To support this allegation, he submitted a redacted copy of the Freeh Memorandum that he had requested and a redacted teletype (which he terms the "BOMBROB-Funding Memorandum") that he claimed to be "from FBI Director Louie Freeh dealing with the very subjects of Plaintiff's *FOIA Request*." Pl.'s Combined Mem. in Opp'n to FBI Defs. Mot. for Summ. J. & Pl.'s Rule 56(f) Mot. for Continuance Pending Disc. at 5–6, *Trentadue v. FBI*, No. 2:04 CV 00772 DAK (D. Utah

Nov. 30, 2004). He asserted that these two documents revealed that "FBI Defendants and/or the SPLC had an informant at Elohim City who reported that two weeks before the bombing of the Murrah Building Tim McVeigh contacted Elohim City trying to recruit others to assist him in carrying out that attack . . . ." J.A. 82. Thus, according to Mr. Trentadue, the "FBI Defendants knew about and fail[ed] to prevent the attack upon the Murrah Building," and therefore had an incentive to withhold documents showing such knowledge. *Id.* at 82–83 (emphasis omitted). Mr. Trentadue also submitted a declaration from a retired FBI agent, stating his belief (1) that the teletypes were authentic, and (2) that "it would be a simple matter to retrieve either of these teletypes" through searches of the "respective case files for the serial[] [numbers] entered on or about the date of each teletype." *Id.* at 96. As the former FBI agent observed, the Freeh Memorandum listed two file numbers belonging to the OKBOMB investigation, 174A-OC-56120 and 91A-OM-41859, and the BOMBROB-Funding Memorandum listed a third file number belonging to that investigation, 100A-PH-79375. In addition, Mr. Trentadue argued that Dees's privacy interest was outweighed by the substantial public interest in disclosure. Finally, Mr. Trentadue filed a request under Federal Rule of Civil Procedure 56(f) for a continuance "until Plaintiff has completed limited discovery on the existence of the documents and/or records in question." Pl.'s Combined Mem. in Opp'n at 3, *Trentadue*, No. 2:04 CV 00772 DAK (Nov. 30, 2004).

-10-

On January 4, 2005, the FBI replied. It clarified that its position was not "that responsive documents do not exist, only that [its] search did not locate any documents responsive to Plaintiff's request." The Federal Defs. Reply Mem. in Supp. of their Mot. for Summ. J. & in Opp'n to Pl.'s Mot. to Strike & Stay Dis. (Defs. Reply) at 6, *id.* (Jan. 4, 2005). It maintained that it had made a good-faith effort to search for the requested documents, warranting summary judgment. To establish its good-faith search efforts, it attached to its reply a December 9, 2004, declaration of David Hardy, Section Chief of the Record/Information Dissemination Section of the FBI's Records Management Division in Washington, D.C. The declaration explained that the FBI's indices to its Central Records System (CRS) generally refer only to subjects of investigations, suspects, and victims, although other names may be indexed by an investigator or supervisor if considered relevant or necessary for later retrieval.[2] It then described the search

[2]Mr. Hardy described the CRS as follows:
(10) The Central Records System ("CRS"), which is utilized by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables it to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in this system are maintained at FBIHQ [FBI headquarters]. Records that are pertinent to specific field offices are maintained in those field offices.
(11) Access to the CRS is afforded by the General Indices,
(continued...)

[2](...continued)
which are arranged in alphabetical order.  The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices.  The entries in the General Indices fall into two categories:

>           (a)     A "main" entry—A "main" entry carries the name corresponding with a subject of a file contained in the CRS.
>
>           (b)     A "reference" entry—"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, etc., contained in a document located in another "main" file.

(12)  Access to the CRS files at FBI field divisions is also afforded by the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations.  Searches made in the General Indices to locate records concerning a particular subject, such as the Southern Poverty Law Center, are made by searching the subject requested in the index.  FBI field divisions have automated indexing functions.

(13)  On October 16, 1995, the Automated Case Support ("ACS") was implemented for all Field Divisions, Legal Attaches ("Legats"), and FBIHQ.  Over 105 million records were converted from automated systems previously utilized by the FBI.  ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases, which are:

>           (a)     Investigative Case Management ("ICM")—ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads.  The Office of Origin ("OO"), which sets leads for itself and other divisions, as needed, opens a case.  The offices that receive leads are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices.  When a case is opened, it is assigned a Universal Case File Number ("OCFN"), such as "12-SU-34567," which is utilized by all FBI offices, including FBIHQ, that are conducting or assisting in the

(continued...)

-12-

for the records requested by Mr. Trentadue, stating that the search for records

²(...continued)
investigation.  The "12" indicates the type of investigation, "SU"
indicates the Office of Origin of the investigation, and "34567"
denotes the individual case file number for that particular
investigation.

(b)    Electronic Case File ("ECF")—ECF serves as the
central electronic repository for the FBI's official text-based
documents.  ECF supports the universal serial concept, where only
the creator of a document serializes it into a file, providing single
source entry of serials into the computerized system.  All original
serials are maintained in the OO case file.

(c)    Universal Index ("UNI")—UNI continues the
universal concepts of ACS by providing a complete subject/case
index to all investigative and administrative cases.  Only the OO is
required to index; however, the LOs may index additional
information as needed.  UNI, an 84.5 million record index, provides
functions to index names to cases and to search names and cases for
the FBI's investigative and administrative cases.  Names of
individuals or non-individuals are recorded with identifying
information, such as sex, race, event date, date or place of birth,
locality, Social Security number, or address.

(14)  The decision to index names other than subjects,
suspects, and victims is a discretionary decision made by the
investigative FBI Special Agent ("SA"), the supervisor in the field
division conducting the investigation, and supervising FBI SA at
FBIHQ.  The FBI does not index every name in its files; rather, it
indexes only that information considered pertinent, relevant, or
essential for future retrieval.  Without a "key" (index) to this mass of
information, information essential to ongoing investigations could
not be readily retrieved.  The FBI files would thus be merely archival
in nature and could not be effectively used to serve the mandated
mission of the FBI, which is to investigate violations of federal
criminal statutes.  Therefore, the General Indices to the CRS files are
the means by which the FBI can determine what retrievable
information, if any, the FBI may have in its CRS files on a particular
subject matter or individual

Decl. of David M. Hardy at 4–7, Attach. to Defs. Reply, *Trentadue*, No. 2:04 CV
00772 DAK.

referring to Dees was awaiting a proper privacy waiver and that the search for the

other records, using "Southern Poverty Law Center" as the search term, was

fruitless.[3]

On February 17, 2005, the FBI submitted a second declaration by

Mr. Hardy. Attached to the declaration was a redacted copy of the Freeh

---

[3]The declaration stated:

(16) A search of the CRS indices at FBIHQ and the Oklahoma City Field Office, and the search of the I and S drives at the Oklahoma City Field Office for records which directly or indirectly, report upon, concern, reference or refer to the SPLC's involvement with and/or connection to Elohim City, BOMBROB, OKBOMB, Timothy McVeigh, Richard Guthrie, Terry Nichols, Dennis Mahon, Robert Millar, Michael Brescia, Peter Langan and/or Andreas Strassmeir including all contacts the SPLC may have indirectly had with the foregoing through informants revealed that FBIHQ and the Oklahoma City Field Office have no records responsive to plaintiff's request. The search was performed using the search term "Southern Poverty Law Center" as that would be the file containing the information sought. The search was performed using the search term "OKBOMB" as that is [the] file under which the memorandum would have been placed.

(17) A search for records pertaining to Morris Dees will be conducted upon receipt of the completed Privacy Waiver and Certification Form which the FBI provided to plaintiff by letter dated November 18, 2004. In the absence of this privacy waiver, the records, if they exist, are exempt from disclosure pursuant to Exemptions 6 and/or 7(C), 5 U.S.C. §§ 552(b)(6), (b)(7)(C). To date, plaintiff has not submitted this form to the FBI.

*Id.* at 8–9.

Memorandum.  The declaration explained why the FBI was now able to produce the document:

> (7) The initial search of the CRS indices at FBIHQ and the Oklahoma City Field Office, ("OCFO") for [the Freeh Memorandum] revealed that, based on the information provided in plaintiff's initial request letter to FBIHQ and the OCFO, the FBI could not locate the original document.
>
> (8) The initial search of the CRS indices at FBIHQ and the OCFO for the [Freeh Memorandum] was conducted by using the search term "Southern Poverty Law Center" as described in the Hardy Declaration ¶ 12.  Additionally, a search for the memorandum using the name "Timothy McVeigh," failed to reveal the [Freeh Memorandum].
>
> (9) Based on new information [the redacted version of the Freeh Memorandum submitted by Mr. Trentadue] attached as Exhibit A to plaintiff's November 23, 2004 REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, it was determined that the document was a teletype dated January 4, 1996.  An electronic search of file 174A-OC-56120 for teletypes dated January 4, 1996, was conducted.  This additional search revealed the teletype in question which was contained within the FBI's OKBOMB investigative file which investigation was conducted pursuant to 18 U.S.C. § 844(d).

Second Decl. of David M. Hardy at 3–4 (footnote omitted), *Trentadue*, No. 2:04 CV 00772 DAK (Feb. 17, 2005).  The declaration did not detail search efforts to find the so-called BOMBROB-Funding Memorandum.

### 3.    The District Court's Initial Ruling

On May 5, 2005, the district court denied the FBI's summary-judgment motion, and granted Mr. Trentadue's partial-summary-judgment motion.  "Given the specific nature of [Mr. Trentadue's] requests . . . and [his] specific evidence

-15-

that at least some of the requested documents do exist and reasonably should have been found by the FBI," the district court found that the FBI's search "was not reasonably calculated to discover[] the requested documents." J.A. Vol. 1 at 159. It concluded that "[w]hen the FBI's computer search did not identify any responsive documents, it was incumbent upon the FBI to review the actual files for such documents." *Id.* at 160.

In a footnote the district court provided further reason why it doubted the adequacy of the FBI's search. It cited documents provided by Mr. Trentadue regarding his FOIA request for records relating to the FBI investigation of his brother's death. One document was a teletype from FBI headquarters to its field offices instructing that documents prepared for the investigation "must not be uploaded into the Automated Case Support [(ACS)] system" without prior approval. *Id.* at 159 n.2 (emphasis omitted). Two other documents were FBI teletypes that the court characterized as indicating that "the FBI lobbied former Senator Don Nickels of Oklahoma to obtain his assurances that no Senate Judiciary Committee oversight would take place with respect to the FBI's handling of the Trentadue investigation." *Id.* at 159–60 n.2.

The district court also ruled that privacy concerns did not justify withholding or redacting documents because the public interest in the information outweighed any privacy interests of the individuals involved. Accordingly, the court ordered that by June 15 the FBI must (1) produce unredacted versions of the

Freeh Memorandum and the BOMBROB-Funding Memorandum, and (2) manually search the OKBOMB files numbered 100A-PH-79375, 174A-OC-56120, and 91A-OM-41859—the file numbers listed on the redacted copies of the teletypes that Mr. Trentadue had provided the court—for documents responsive to Mr. Trentadue's FOIA request. The court denied as moot Mr. Trentadue's motion for a continuance pending further discovery, but added that "[u]pon motion, the court will permit Plaintiff to conduct discovery should the FBI fail to produce documents and/or records responsive to his FOIA request." *Id.* at 160.

### 4. FBI's Motion for Reconsideration and District Court's Revised Order

The FBI moved for reconsideration of the district court's order. It claimed that (1) the redacted material in the Freeh Memorandum was exempt from disclosure because it would compromise the identity of and information provided by a confidential informant; (2) the BOMBROB-Funding Memorandum did not reference the SPLC and therefore was not responsive to Mr. Trentadue's initial FOIA request; and (3) the additional search ordered by the court would be unduly burdensome.

In support of its motion, the FBI submitted a third declaration from David Hardy. Hardy stated that file number 174-OC-56120, one of the three files to be searched under the court's order, contained about 1,152,000 pages. He asserted that the manual search ordered by the court would be "extremely time consuming

-17-

and unprecedented in the history of the FBI FOIA Program." *Id.* at 204. (The agency's brief below estimated that such a manual search would require "thousands of work hours to complete." *Id.* at 192.) Mr. Hardy also described interim search efforts that the FBI had conducted in an attempt to comply with the order. He said that the FBI had manually searched two of the three files named in the order, which contained about 4,100 pages. And with respect to the 174A-OC-56120 file, the agency had performed an electronic search. He described that search as a

> "text search" of the ZyIndex which is not a shared drive, but rather is an automated system component which has been used by the OKBOMB Task Force. ZyIndex is an off-the[-]shelf software application that indexes words and phrases to allow an electronic retrieval of documents. An initial "text search" conducted on the ZyIndex indicates that there are approximately 340 documents that are potentially responsive to plaintiff's request. It took two individuals two days to conduct this burdensome search of the index for the terms "Elohim/Poverty;" "Elhoim/Poverty;" "OKBOMB/Poverty;" "BOMBROB/Poverty;" "McVeigh/Poverty;" "Guthrie/Poverty;" "Nichols/Poverty;" "Mahon/Poverty;" "Millar/Poverty;" "Brescia/Poverty;" "Langan/Poverty;" and "Strassmeir/Poverty."

*Id.* at 205 (footnotes omitted). The 340 potentially responsive documents had not yet been reviewed by the agency to weed out duplicates and to determine whether the documents were responsive and not covered by FOIA exemptions.

In addition, Mr. Hardy provided the context behind the FBI's teletype instructing its field offices not to upload into the ACS system any documents from the investigation into the death of Mr. Trentadue's brother. Such uploading,

Mr. Hardy explained, would have made the text of these classified documents available electronically, thereby jeopardizing the security and privacy of FBI employees. (Apparently, some FBI employees were subjects of the investigation and others were witnesses.) The documents would still be retrievable through an electronic search of the FBI's computerized indices.

The district court stayed its initial order pending further briefing. It added that "[t]o the extent that [the FBI has] discovered documents that are responsive to Plaintiffs's FOIA requests (as interpreted by [the FBI]) and to which [the FBI does] not assert any FOIA exemption, [it] shall produce such documents as they become available." *Id.* at 239. On July 22, 2005, the FBI produced 17 documents and filed a "Notice of Release of Documents to Plaintiff" with the court. *Id.* at 240.

Still unsatisfied, Mr. Trentadue filed a response to this notice on July 28, 2005. He claimed that the documents produced were improperly redacted and that the FBI could have produced more documents because (1) the documents produced referenced other responsive documents (*e.g.*, enclosures with teletypes) that were not produced; (2) the oldest document produced was generated a week after the Oklahoma City Bombing, even though the FBI's undercover investigations had allegedly begun before the bombing; and (3) the FBI still had not yet performed searches using the terms "Morris Dees" or the initials "SPLC."

The FBI responded that its production of the 17 documents was not in bad faith. It maintained that it had not omitted documents that were referenced by the documents it had produced. Another declaration from David Hardy explained that "[i]f a released document referred to or referenced another document, the referred to or referenced document was also released if it, too, was responsive to plaintiff's FOIA requests . . . ." *Id.* Vol. 2 at 497. Likewise, "[e]nclosures referred to by a released document were included in the July 21 release, if the enclosures were located in the FBI's search. There were two such enclosures." *Id.* at 498. Hardy noted that follow-up searches were sometimes necessary to locate these enclosures, because "[a]s a general matter, in the filing process, enclosures often become separated from their cover documents." *Id.* Two enclosures were not located. One was a floppy disk; Hardy stated that "[f]loppy disk enclosures are destroyed in the ordinary course." *Id.* The other was a newspaper article, although the article was "identified [in the released document] with sufficient specificity for [Mr. Trentadue] to obtain the document from public sources, should he so desire." *Id.*

In an order issued on March 30, 2006, the district court declined to reconsider its earlier finding that the FBI's initial search had not been reasonably calculated to uncover responsive documents. The court did, however, agree with the FBI that it need not produce the BOMBROB-Funding Memorandum, whose failure to mention either Dees or the SPLC made it nonresponsive to

-20-

Mr. Trentadue's initial FOIA requests. And it agreed with almost all the FBI's redactions. Most relevant to this appeal, it "relieved [the FBI] of conducting a manual search of the OKBOMB file . . . ." *Id.* Vol. 3 at 902. Instead, the court ordered the FBI to conduct searches like those already conducted but using the names "Morris Dees" (overruling the FBI's privacy contention) and "SPLC" (the FBI had employed the search term *poverty* in its ZyIndex to cull documents mentioning the Southern Poverty Law Center). The court noted:

> [I]t is so troubling that . . . the disclosed documents also refer to other attachments that at one time appear to have accompanied the document, yet these documents have not been produced. While the FBI's failure to discover documents is not necessarily an indication of bad faith, it is puzzling that *so many* documents could be referenced but not produced. But given the nature of Plaintiff's initial FOIA request and the searches that have been conducted by the FBI thus far, the court declines to order further searches beyond what the court has ordered above. It appears likely, however, that the FBI has not seen the last FOIA request from Plaintiff.

*Id.* at 901. After further searching, the FBI produced one additional document.

### 5. Mr. Trentadue's Motion for Discovery and District Court's Ruling

In February 2007, eight months after the FBI's production of the additional document, Mr. Trentadue filed the motion that generated this appeal. The motion seeks authorization to take videotaped depositions of Terry Nichols, who was convicted for his role in the Oklahoma City Bombing, and David Paul Hammer, a death-row inmate who claimed to have discussed the bombing in detail with Timothy McVeigh while the latter was on death row. In the motion

-21-

Mr. Trentadue reiterated his allegation that the FBI's production of documents had been in bad faith because other responsive documents—especially ones created before the bombing—had to be in FBI files. The depositions of Nichols and Hammer, he asserted, would "set forth facts establishing a link between Elohim City and the Murrah Building bombing," thereby "establishing FBI Defendants' apparent complicity in that crime through informants," *id.* Vol. 4 at 988, and would provide evidence of "FBI Defendants' bad faith response to Plaintiff's FOIA requests," *id.* at 1008. To support his motion, Mr. Trentadue submitted declarations by Hammer and Nichols, both of whom gave accounts of alleged involvement of government informants in the bombing.

The FBI opposed the motion, arguing: (1) the district court lacked jurisdiction to grant discovery because the district court had already resolved all issues in the case and had no authority under FOIA to order discovery designed only to further a private investigation into terrorism; and (2) Mr. Trentadue had provided no grounds for reopening the case under Federal Rule of Civil Procedure 60(b) and had presented no evidence to support a suspicion that Defendants had inadequately responded to his FOIA request.

Stating that it had never closed the case, the district court granted Mr. Trentadue's discovery request. With respect to the merits of the discovery request, the court cited its earlier order stating that "[u]pon motion, the court will allow Plaintiff to conduct discovery should the FBI fail to produce documents

-22-

and/or records responsive to [his] FOIA requests." *Id.* at 1155 (internal quotation

marks omitted; first brackets in original). The court then explained:

> In light of (1) the court's previous finding that the FBI's original
> search was not reasonably calculated to locate responsive documents;
> (2) the troubling absence of documents to which other documents
> referred; and (3) the information that Plaintiff has thus far discovered
> from Terry Lynn Nichols and David Paul Hammer, the court is
> persuaded that it continues to maintain jurisdiction over this action,
> and, furthermore, that by allowing the requested depositions,
> Plaintiff may be better able to identify the existence of other records
> responsive to his FOIA request that have not yet been produced.

*Id.*

The FBI filed a motion for reconsideration. It reiterated its earlier

arguments, but also stressed that discovery in a FOIA action should be limited to

"the scope of the agency's search for responsive documents and its indexing and

classification procedures," not expanded into "a fishing expedition into the

investigatory action taken by the agency . . . ." *Id*. at 1161. Because Nichols and

Hammer lacked any knowledge of the FBI's search for records, the FBI argued,

deposing them would be tantamount to "conduct[ing] discovery into the

Oklahoma City bombing investigation," an unprecedented move given that neither

Mr. Trentadue, nor the court, cited any authority allowing for depositions of

nonagency personnel. *Id.* The FBI also argued, alternatively, that the court

should prohibit video recording of the depositions out of concern for prison

security.

-23-

The district court denied Defendants' motion except that it ordered that the video show only the deponents and placed other restrictions on the use of video-recording equipment. The court closed the case, but added that "[i]f Plaintiff is correct and through these depositions he discovers the existence of records responsive to Plaintiff's FOIA request, he may file a motion to reopen the case." *Id.* at 1313.

## III. DISCUSSION

The issue before us on appeal is whether the district court properly authorized the depositions of Nichols and Hammer. The FBI argues that such discovery is inappropriate because (1) the FBI has submitted detailed affidavits establishing the reasonableness of its search, and the district court never found the described search to be inadequate or to have been conducted in bad faith; (2) discovery in FOIA proceedings is limited to the adequacy of the agency's search processes, not its outcome; (3) the depositions of Nichols and Hammer can provide no information about the nature or scope of the agency's search; (4) the declarations of Nichols and Hammer do not even mention the Southern Poverty Law Center or Morris Dees, which are the subjects of the FOIA request; and (5) videotaped depositions of federal prisoners present substantial security concerns.

We review the district court's discovery order for abuse of discretion. *See Wood v. FBI*, 432 F.3d 78, 82 (2d Cir. 2005) (discovery in FOIA case). "A district court abuses its discretion where it commits a legal error or relies on

clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 866 (10th Cir. 2009) (internal quotation marks omitted).

In our view, issuance of the discovery order was an abuse of discretion. The only proper purpose that we can see for the depositions of the two prisoners, Nichols and Hammer, would be to establish that the FBI likely possesses documents encompassed by Mr. Trentadue's request. But taking the depositions for that purpose would be improper because (1) Mr. Trentadue has provided no reason to doubt (a) that the FBI has performed the searches described in the declarations submitted by it and (b) that there are no reasonable methods by which the FBI could locate the requested records beyond those described in the declarations; and (2) there is no reason to believe that the depositions could produce evidence of the existence of unproduced responsive records.

First, as we explained at the outset of this opinion, the issue in a FOIA lawsuit challenging an agency's search for records is not whether there exist further documents responsive to a FOIA request but whether the agency conducted a reasonable search for responsive documents. Perhaps the FBI's initial search was inadequate (an issue we need not address), but the searches ultimately conducted were very thorough. Not only did it search its CRS indices for records described in Mr. Trentadue's FOIA request, but it manually searched two files and conducted a ZyIndex search of the principal file relating to the

Oklahoma City Bombing. Apparently, the only additional search that could have been conducted would have been a manual search of more than one million pages in that principal file—a search that, according to the FBI, would be an unprecedented FOIA effort by the agency that would take thousands of hours of work. To be sure, the FBI's description of its search effort was in the form of a declaration, not cross-examined testimony. But declarations and affidavits are the widely accepted, even the preferable, means for an agency to respond to concerns about the adequacy of a FOIA search. We agree with the Sixth Circuit:

> In discharging this burden [to show the adequacy of its search], the agency may rely on affidavits or declarations that provide reasonable detail of the scope of the search. In the absence of countervailing evidence or apparent inconsistency of proof, such affidavits will suffice to demonstrate compliance with the obligations imposed by the FOIA.

*Rugiero*, 257 F.3d at 547 (citations, brackets, and internal quotation marks omitted). *See Becker v. IRS*, 34 F.3d 398, 405 (7th Cir. 1994) ("An agency may establish the reasonableness of its search through affidavits."); *Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986) (Scalia, J.) ("Summary judgment . . . would require an affidavit reciting facts which enable the District Court to satisfy itself that all appropriate files have been searched, *i.e.*, that further searches would be unreasonably burdensome. Such an affidavit would presumably identify the searched files and describe at least generally the structure of the agency's file system which makes further search difficult.");

-26-

*Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) ("The peculiarities inherent in FOIA litigation, with the responding agencies often in sole possession of requested records and with information searches conducted only by agency personnel, have led federal courts to rely on government affidavits to determine whether the statutory obligations of the FOIA have been met."); James T. O'Reilly, *supra* § 7:5 at 165 ("In general, an agency search is adequate where the affidavit shows a good faith effort to use reasonable means to produce the information sought."). "Discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face, and a district court may forgo discovery and award summary judgment on the basis of submitted affidavits or declarations." *Wood*, 432 F.3d at 85 (brackets and internal quotation marks omitted).

An agency "is not required to reorganize its filing system in response to each FOIA request," *Goland*, 607 F.2d at 370; and Mr. Trentadue has failed to suggest any search method that the FBI has not used other than a manual search of the primary Oklahoma City Bombing file—an unreasonably burdensome search that the district court ultimately relieved the FBI from undertaking. Nor has Mr. Trentadue presented any reason to believe that the FBI's descriptions of its searches have been flawed in any respect. He and the district court have expressed surprise and concern that the agency did not produce enclosures and

other documents referenced in disclosed documents; but the declaration from the section chief of the FBI's Record/Information Dissemination Section explained that only two enclosures (a floppy disk destroyed in the ordinary course and a newspaper article) were missing and the undisclosed cross-referenced documents were not covered by Mr. Trentadue's FOIA request. In sum, the FBI's declarations provide an internally consistent and uncontradicted record that it conducted an adequate search for the documents requested by Mr. Trentadue. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." (internal quotation marks omitted)).

In this light, the discovery sought by Mr. Trentadue cannot be justified. He has failed to show any possibility that the depositions of Nichols and Hammer would produce relevant evidence in this case. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351–52 (1978) ("Discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1)."); Fed. R. Civ. P. 26(b)(1) (discovery permitted if it is "reasonably calculated to lead to the discovery of admissible evidence"); *see also id.* 26(b)(2)(C)(iii) (courts must limit otherwise-permissible discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties'

resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues"). Nichols is a convicted coconspirator in the Oklahoma City Bombing and Hammer is a death-row inmate and alleged confidant of Timothy McVeigh, who has been executed for the offense. Nichols and Hammer clearly have no knowledge regarding FBI procedures in filing and searching for records—which are the only relevant matters in FOIA litigation challenging an agency's records search. Only present or past agency employees would have knowledge of those matters, which readily explains why we have been cited to no precedent for deposing nonagency personnel in FOIA cases. Mr. Trentadue (and apparently the district court) may have supposed that the depositions would reveal that the FBI must have created a record that has not been produced in response to Mr. Trentadue's FOIA request. But even if the existence of such a record were relevant, it is pure speculation that such a revelation would be forthcoming. After all, Mr. Trentadue's FOIA request was limited to records relating to Morris Dees and the SPLC, yet the declarations of Nichols and Hammer submitted by Mr. Trentadue to the district court make no mention of either Dees or the SPLC.

To conduct the discovery requested by Mr. Trentadue would be an abuse of judicial process.

## IV.   CONCLUSION

We REVERSE the district court's order granting Mr. Trentadue's motion to conduct discovery. The parties' motions to supplement the appendix and the record are DENIED.